IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TIMOTHY F., a minor, individually and by and
through his parents, FERNANDO F., and
DAMARIS F., of Reading, PA,

     Plaintiffs,

v.

ANTIETAM SCHOOL DISTRICT,

     Defendant.

CIVIL ACTION
NO. 12-2719

## MEMORANDUM

**SCHMEHL, J.**                                 **March 31, 2014**

   In this action under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. §§1400-1419, Plaintiff Parents argue Defendant School District failed to appropriately evaluate their son, failed to find him eligible for special education as it should have, and thus failed to provide him with a Free Appropriate Public Education as required under the law. Parents further claim the service plans under §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, did not adequately enable their son to access the District's educational program. The administrative hearing officer who previously heard the matter disagreed and denied Parents' request for compensatory education. For reasons discussed below, the Court agrees with the hearing officer and will grant judgment in favor of the District.

Factual and Procedural Background

   Student spent kindergarten at a private school, attended first grade at a different nearby public school district, and went back to private school for second grade, before

enrolling at the Defendant District near the beginning of third grade. At the other public school, he was evaluated and found ineligible for special education but given accommodations under a §504 Service Agreement for issues related to cerebral palsy and attention deficit/hyperactivity disorder (ADHD).

Student enrolled at the District in the fall of 2009, at which time Parents requested an evaluation. As part of the evaluation, the school psychologist conducted a discrepancy analysis, wherein a severe discrepancy between Student's underlying ability and his actual achievement would suggest a need for specially designed education to bring his performance up nearer the level of his potential. For ability, the psychologist administered the Wechsler Intelligence Scale for Children Fourth Edition (WISC-IV), which resulted in a Full Scale IQ (FSIQ) of 101, with individual sub-scores in the same range. For achievement, the psychologist used the Woodcock Johnson Tests of Achievement Third Edition (WJ-III). Generally, the WJ-III scores showed achievement comparable to Student's ability, though three of the math achievement scores were rather low and two diverged from the ability scores by an amount that the psychologist considered on the border of a severe discrepancy; one of the reading categories also showed a lesser but significant discrepancy. One of the writing scores was also on the border of severe discrepancy, but the psychologist testified that writing scores tend to have larger differences. Using her judgment, and in part because of scores on additional tests administered to provide a fuller picture of Student, including the Oral and Written Language Scales (OWLS), Dynamic Indicators of Basic Early Literacy Skills (DIBELS), and Group Mathematics Assessment and Diagnostic Evaluation (GMADE), the psychologist decided that the borderline divergence on certain scores did not constitute a

severe discrepancy. Also factoring into the evaluation was information from Parents, Student's teacher, and the psychologist's own observation of Student, including rating scales for attention and behavior (Connors Rating Scales-Revised, Behavior Rating Inventory of Executive Function (BRIEF), and Behavior Assessment System for Children-Second Edition (BASC-II)). Parents' ratings for behavior and social issues were much worse than the teacher's. The psychologist also screened for occupational therapy issues by considering Student's "handwriting skills, his functioning in the classroom and his performance on visual motor assessments," evidently including the Bender Gestalt Test of Visual Motor Skills, and determined that full evaluation was unnecessary.[1]

Having concluded that there was no severe discrepancy in the academic areas, and finding the teacher's behavior ratings in line with her own conclusion that Student's behavior issues were not detrimental to his ability to learn in the regular classroom setting, the psychologist concluded in her evaluation report that Student was not eligible for special education under the IDEA. The school did, however, provide services under §504, including extra time for tests, repeated instructions when needed, available meetings with the school counselor, and the use of sensory devices for relaxation and focus. Student finished the school year, third grade, with A and B grades in academics and Satisfactory in behavioral areas.

Parents obtained two outside evaluations of Student that diagnosed him with Asperger's, and the District added that to the evaluation report. The §504 plan was subsequently updated to add further accommodations for focus and academic practice. Parents requested a reevaluation in fall 2010 at the beginning of Student's fourth-grade year. The reevaluation incorporated many of the same assessments as the previous

---

[1] Hearing Tr. 44, November 11, 2011; S-4 p.8.

evaluation and added speech and language assessmnts (Clinical Evaluation of Language Fundamentals-Fourth Edition (CELF-4) and Expressive One Word Picture Vocabulary Test (EOWPVT)). In most areas, Student improved relative to his previous performance and relative to his ability; he did, however, fall behind and display increased discrepancy in two areas of math. The teacher indicated Student was doing reasonably well in math, so the psychologist administered an additional assessment, KeyMath, which again showed some areas of difficulty. Conversation with Student himself suggested he liked math in class but had trouble with standardized testing. Some of the behavior ratings got worse, and Parents' scores were again much worse than the teacher's; however, ratings within the assessment specially designed to account for the subjectivity of the scores suggested Parents' scores were excessively negative. The psychologist observed Student in class on multiple occasions but was unable to confirm the Asperger's diagnosis. For the reevaluation, Student underwent a full occupational therapy assessment that showed no significant problems.

The reevaluation resulted in a determination that Student did have a disability in math but did not require specially designed instruction—at least partly because the regular classroom environment seemed to be where he fared best both in math and behaviorally—and was, therefore, ineligible under the IDEA. The District did continue to provide services in accordance with the updated §504 plan.

Shortly after the reevaluation, near the end of 2010, Student left the District and enrolled in a cyber charter school. Parents have suggested this change was due to their lack of confidence in the education the District was providing, but at the time, they indicated it was because Student's mother travels internationally for her job. The charter

school conducted yet another evaluation of Student that concluded he was eligible under the IDEA. The charter school's evaluation found a primary disability of autism and secondary disabilities related to speech and language impairment, ADHD, and cerebral palsy.

These findings seem to have prompted Parents to challenge the District's earlier determinations that Student was ineligible. They filed for a due process hearing on August 12, 2011, and the hearing was conducted November 7, 2011, and January 12, 2012. The only witnesses were the school psychologist and the District Supervisor of Special Education. On February 19, 2012, the hearing officer issued a written decision finding that the evaluations were appropriately conducted and the conclusions that Student was ineligible under the IDEA were proper and within reasonable professional judgment. In so finding, the hearing officer did not thoroughly consider the later charter school evaluation, but did offer the perspective that poor results in the cyber (and therefore at-home) charter evaluation dovetailed with Parents' negative behavior ratings, suggesting, as did other evidence, that the structure of the regular classroom environment encouraged greater focus and lessened Student's difficulties as compared with the home environment. Parents appealed the hearing officer's decision to this Court on May 17, 2012, and moved for summary judgment on November 14, 2012. The District filed a motion for judgment on the administrative record the same day. There have been no motions to consider additional evidence.

Discussion

School districts have a "Child Find" obligation under the IDEA and §504 that includes suspecting disability when they reasonably should (not at issue here because the evaluations were conducted at Parents' request) and conducting appropriate evaluations when disability is suspected. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012). School districts must also make correct determinations on the basis of those evaluations because the basic Child Find obligation is to identify children with disabilities in need of special education.

The questions of whether an evaluation is conducted correctly and whether the resulting eligibility determination is correct are necessarily mixed in the overarching question of whether a district has complied with its Child Find obligation. The Court here follows the hearing officer's decision in separating those inquiries to the extent possible; thus, the Court's analysis is broken into three issues aligned with Parents' enumerated requests for reversal of the hearing officer's determinations: whether the District conducted the evaluations appropriately; whether finding Student ineligible after both evaluations was proper; and whether the §504 agreements were sufficient.[2] The Court will address Parents' repeated assertions that certain data were ignored in the section regarding the determinations rather than the section regarding the evaluations, because it is plain that such data were at least collected in the course of the evaluations. Similarly, Parents' reliance on the contrary results of the charter school's subsequent evaluation is really an attack on the determinations, not an attack on the conduct of the evaluations.

---

[2] Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment (Docket #12) at 2. The remainder of Parents' enumerated points concern remedies rather than substantive matters; as the Court agrees with the hearing officer's determinations, there is no need to discuss remedies in detail.

Standard of Review

When reviewing administrative decisions under the IDEA, district courts are to employ a "modified *de novo*" standard, giving "due weight" to the hearing officer's factual findings. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269-70 (3d Cir. 2003). The court "must make its own findings by a preponderance of the evidence," *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013), but must also defer to the hearing officer's credibility determinations and should only depart from the hearing officer's factual findings if it can "point to contrary nontestimonial extrinsic evidence on the record." *S.H.*, 336 F.3d at 270. This deference is due at least in part to the administrative expertise in educational issues and the related principle that the court should not "substitute its own notions of sound educational policy for those of local school authorities." S.H., 336 F.3d at 270 (quoting *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 531 (4th Cir. 2002)); *see also Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 284 n.23 (3d Cir. 1996) (noting that exhaustion is required in part because of the "specialized expertise of state education officials," including with respect to appropriate IDEA evaluation procedures).

Whether the specific IDEA questions at issue in this case are questions of fact is in contention. The question of whether Student was properly found ineligible is fundamentally a question of whether Student received a Free Appropriate Public Education (FAPE), and the Third Circuit has held that is a question of fact. *See D.K.*, 696 F.3d at 243 (quoting *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir.2009).[3] The question of whether the evaluations were appropriately

---

[3] This holding ultimately derives from cases holding, somewhat more narrowly, that "whether an IEP is appropriate is a question of fact." *S.H.*, 336 F.3d at 271. The Court will follow the rule even though in this

7

conducted may be less an issue of fact, as it involves comparing the evaluations to a statutory standard. On both questions, though, state education officials' expertise is invaluable, and on both questions, the Court's conclusion in this case would in any event be the same whether it treats the issue as a question of fact or a question of law.

There appears to be no direct guidance on the standard of review applicable to claims under §504, but despite the similarity of the substantive provisions of §504 and the IDEA, one court has applied an ordinary *de novo* standard to §504 rather than the modified version. *T.F. v. Fox Chapel Area Sch. Dist.*, 12-CV-1666, 2013 WL 5936411 (W.D. Pa. Nov. 5, 2013). This Court will follow suit while recognizing that the education professionals' greater expertise with educational matters is nevertheless still a factor in the §504 context.

Appropriateness of the Evaluations

Once the obligation to evaluate a child for IDEA eligibility is triggered, as it was by Parents' requests in this case, a school must conduct the evaluation in accordance with certain prescriptions. Among other requirements, the evaluation must: consider all areas of suspected disability; utilize a variety of technically sound assessment tools and not allow any one tool to be the sole determinant; assess cognitive, behavioral, physical, and developmental factors; and include information from a variety of sources, including the parents. *See* 20 U.S.C. §1414; *D.K. v. Abington Sch. Dist.*, CIV.A.08-CV-4914, 2010 WL 1223596 (E.D. Pa. Mar. 25, 2010), *aff'd*, 696 F.3d 233 (3d Cir. 2012); 34 C.F.R. §300.306.

---

case the question is whether an Individualized Education Program (IEP) should have been provided in the first place.

A few potential defects in the conduct of the first evaluation can be gleaned from Parents' brief: failure to evaluate occupational therapy needs; failure to complete assessments of attention, focus, impulsivity, and behavior; and the use of certain assessment tools (DIBELS and GMADE) that are not technically sound as used. All other complaints about the first evaluation, and all issues with the second evaluation, concern the eligibility determinations rather than the evaluations.

Parents argue that occupational therapy was an area of suspected disability requiring evaluation because the previous evaluation and §504 agreement from the other public school indicated problems in that area. The psychologist did conduct an initial screening, and because Parents did not offer their own witness on the issue, the hearing officer concluded the psychologist was correct in deciding that such screening was sufficient to obviate the need for further assessment. There is likewise no evidence on the record on which the Court might base a finding that such screening was insufficient. The psychologist considered Student's handwriting, his functioning in the classroom, and his performance on visual motor assessments, including the Bender Gestalt Test of Visual Motor Skills, which appears to comport with the statutory mandate to utilize multiple methods of assessment. It is also clear that the evaluation thoroughly considered behavior and attention issues. Parents and the teacher completed the BRIEF and BASC-II assessments that address those very issues, and the psychologist considered behavior and attention in her direct observation of Student. The evaluation, therefore, did not fail to appropriately assess all areas of suspected disability.

As for the use of DIBELS, the psychologist admitted that, while the test may be technically sound in and of itself, testing protocols provide that it is not to be used for

9

IDEA eligibility. She stated that GMADE is not to be used specifically for the discrepancy analysis, though it is not clear whether she agreed that it is inappropriate for IDEA eligibility generally. The evaluation report and the psychologist's testimony demonstrate that the actual discrepancy analysis was based on the difference between the WISC-IV results for ability and the WJ-III results for performance. To the extent the DIBELS and GMADE factored in, the psychologist merely used them to get additional perspective on Student, or possibly to influence her resolution of those areas where she found the WISC-IV and WJ-III scores indicated a borderline discrepancy. Even discounting the DIBELS and GMADE entirely, the evaluation still included the necessary variety of technically sound assessment tools. It would have been acceptable for the psychologist to make a call on the borderline discrepancy areas based merely on her own judgment and experience; factoring in additional technical tools such as the DIBELS and GMADE serves to inform and improve that judgment call rather than detract from it. It is worth noting that this issue goes well into technical educational areas beyond the Court's expertise, and it would be foolish to discount the psychologist's and the hearing officer's approval of these methods given the lack of a contrary witness on Parents' side. The Court can only conclude that the tangential use of the DIBELS and GMADE assessments did not taint the evaluation.

    The first evaluation did appropriately assess occupational therapy, behavior, and attention, and the merely supplemental use of the DIBELS and GMADE assessments does not invalidate the evaluation. Parents have not identified other defects in either evaluation, so the Court finds they were conducted appropriately.

Propriety of the Determinations that Student Was Not IDEA Eligible

The Child Find obligation requires schools to identify children with disabilities, and because of the way that term is defined, that means a proper determination of IDEA eligibility rests on a finding not only that a child has a disability, but also that he or she, "by reason thereof, needs special education and related services." 20 U.S.C.A. §1401; *see also* 34 C.F.R. §300.8. As noted above, the correctness of eligibility determinations is generally subsumed into the overall question of whether a district violated its Child Find obligation. Further, in most cases, the Courts are called on to determine whether an Individualized Education Plan (IEP) is appropriate or sufficient, rather than whether one should have been offered when it was not, so there is relatively little guidance for assessing the latter type of determination.

Where courts have performed the latter type of review, they have simply noted the results of appropriately conducted evaluations, considered whether the determination took into account all the appropriate data, and engaged in their own assessment of the conclusion that a child was ineligible based on the data from the evaluation and the general logic and reasonability of the district's and hearing officer's findings. *See Ridley Sch. Dist. v. M.R.*, CIV.A. 09-2503, 2011 WL 499966 (E.D. Pa. Feb. 14, 2011) (reviewing the conclusion, after an initial evaluation in kindergarten, that the child did not have a disability and noting that "her cognitive functioning and academic skills were well within average ranges, and her classroom assessments indicated steady progress"), *aff'd*, 680 F.3d 260 (3d Cir. 2012); *M.B. ex rel. J.B. v. S. Orange/Maplewood Bd. of Educ.*, CIV.A. 09-5294 (SRC), 2010 WL 3035494 (D.N.J. Aug. 3, 2010) (finding the record did not support a determination that the student was ineligible where all the data

showed a severe discrepancy except a statistical computer analysis of the achievement and ability scores, because regulations mandate that the determination "must be based on more than a formula-driven numerical assessment"); *H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 451-52 (D.N.J. 2011) (reviewing the data and agreeing with the ALJ that the student did not have a specific learning disability in reading fluency). Such an analysis suits the modified *de novo* standard of review described above, where the court must make its own factual determinations but diverge from those of the hearing officer only when it can support its reasons for doing so.

For the first evaluation in this case, in most areas, Student's achievement not only matched his ability but was within the average range. In those few areas where his achievement was farther below his ability, the scores were on but not over the edge of severe discrepancy. The additional scores on the OWLS, DIBELS, and GMADE, along with the more qualitative data from the teacher and the psychologist's observation of Student, provides a sufficient basis on which to find that Student did not display a disability in those areas where he nevertheless had some trouble. As for attention and behavior issues and Parents' insistence that their own opinions of Student's problems were "ignored," it is important to recognize that there is a difference between, on the one hand, *ignoring* data, and on the other hand, *considering* data but finding it unpersuasive or outweighed by other evidence.[4] The District and the hearing officer took Parents' scores and so forth into account but disagreed with Parents for sound reasons. First, the teacher and psychologist scores were much less severe, and it is perfectly reasonable to find those scores more credible and compelling. The teacher and psychologist see Student

---

[4] Parents' counsel appears to have exhibited this same misunderstanding of what it means to ignore evidence in *D.K. See D.K.*, unpublished District Court opinion, *supra*.

12

in the most relevant setting, they have expertise in evaluating students, and they may have a greater perspective for comparison due to their experience with many different children. Further, the questions within the behavior assessments designed to catch excess subjective negativity provide concrete data that Parents' ratings were unduly negative. Finally, while Parents impugn as speculative the hearing officer's theory that Student exhibits more appropriate behavior in the structured classroom environment than at home, it is a logical explanation that fits the facts. The finding of ineligibility after the first evaluation was proper.

The fact that Student appeared to perform well and at his best in the regular classroom environment supports the finding, after the second evaluation, that Student had a disability but did not require specially designed instruction. The question of what type of instruction will best suit Student's needs is the sort most clearly within the expertise of the District as compared with the Court. Given Parents' failure to present a contrary expert to suggest the appropriateness of more specialized measures, the Court can only find that the record supports the District's and hearing officer's conclusion regarding the determination of ineligibility after the second evaluation as well.

The propriety of the ineligibility determinations is not undermined by the subsequent finding of eligibility by the cyber charter school. "The mere fact that a subsequent evaluation . . . yielded a different result . . . does not necessarily render the earlier testing inadequate." *D.K.*, 696 F.3d at 251 (citing *Ridley Sch. Dist.*, 680 F.3d at 264-66). The hearing officer was correct to note that the conditions of the charter school evaluation were insufficiently clear on the record. What we do know of those conditions is that they were quite different from the context in which Defendant District evaluated

Student. Though a relatively short time had passed, Student's situation had changed substantially in ways that might well have occasioned disability findings that would not have made sense at either of the times the District evaluated Student.

### Sufficiency of the §504 Service Agreements

A claim for violation of §504 of the Rehabilitation Act has four elements: 1) the student is disabled; 2) the student is otherwise qualified to participate in school activities; 3) the school receives federal financial assistance; and 4) the student was "excluded from participation in, denied the benefits of, or subject to discrimination at" the school. *M.R.*, 680 F.3d at 280. Though this is framed as a negative prohibition in terms of discrimination, the rule is similar to the duty under the IDEA and requires provision of a free appropriate public education (FAPE). *Id.* To provide a FAPE "under the Rehabilitation Act, a school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Id.* The sufficiency of a §504 service plan may be demonstrated at least in part by improving grades. *See Anello v. Indian River Sch. Dist.*, 355 F. App'x 594, 598 (3d Cir. 2009).

The §504 plans in this case were sufficient. After the initial evaluation, in which the District found no disability, Student received extra time for tests, repeated instructions, available meetings with the school counselor, and sensory devices to help with focus. He received more detailed, updated accommodations prior to the second evaluation and after the outside Asperger's diagnosis, including scheduled counselor meetings and a prearranged signal teachers can use to direct his focus. As the District and

hearing officer found, these accommodations suited Student's needs. He finished third grade with academic grades in the A and B range and behavior grades of Satisfactory, suggesting he was adequately accessing the education benefits of the District. The teacher's and psychologist's observations show he was generally engaging in classroom activities. When Student was reevaluated, he had improved in most areas, again indicating he was receiving meaningful educational benefit. In those areas of math where he did fall behind relative to his peers and his potential, the accommodations (extra time for tests, etc.) were appropriate because the evaluations, including the teacher's opinion and Student's own input, indicated that he did better in math in the classroom despite trouble with testing. Considering grades, standardized evaluation results, and qualitative input, Student meaningfully benefitted from the education the District made available to him; therefore, the hearing officer did not err in finding that the District did not violate §504.

Conclusion

Parents' attack on the hearing officer's determination rests mainly on repeated complaints that their own opinions of Student's behavior were ignored, that the District fails to provide a good education in general,[5] and that the District's IDEA eligibility determinations simply must have been mistaken in light of the subsequent cyber charter school evaluation. When refined and sorted into the appropriate legal framework, as in

---

[5] The Court agrees with the hearing officer that any alleged failings of the District's education and curriculum in general are irrelevant to the determination at issue, both because of the provision in 20 U.S.C. §1414(b)(5) that a finding of IDEA eligibility shall not be based on "lack of appropriate instruction" in math or reading and because the entire IDEA eligibility endeavor is geared toward determining whether a particular student needs specially designed instruction different from what is available in the regular classroom, not whether a district's performance is up to parents' standards.

15

the analysis above, those complaints do not militate against affirming the hearing officer's decision; therefore, the Court will grant the District's motion for judgment on the administrative record and deny Parents' motion for summary judgment.